**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: JOHN ALAN HARBIN,

*Debtor.*

———————————

JEFFREY SHERMAN,

*Plaintiff-Appellee,*

v.

JOHN ALAN HARBIN,

*Defendant-Appellant,*

and

INDYMAC BANK FSB,

*Defendant.*

No. 04-56799

D.C. No.
04-CV-0209-BTM

In re: JOHN ALAN HARBIN,

*Debtor.*

———————————

JEFFREY SHERMAN,

*Plaintiff-Appellant,*

v.

JOHN ALAN HARBIN; INDYMAC
BANK FSB,

*Defendants-Appellees.*

No. 04-56865

D.C. No.
04-CV-0209-BTM

OPINION

Appeals from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
November 17, 2006—Pasadena, California

4551

Filed April 25, 2007

Before: Richard D. Cudahy,* Susan P. Graber, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Cudahy

---

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

## COUNSEL

John L. Morrell and Paul J. Leeds, Higgs, Fletcher & Mack LLP, San Diego, California, for defendant-appellant John A. Harbin.

Lon B. Isaacson and Larry D. Johnson, Lon B. Isaacson Associates, Los Angeles, California, for plaintiff-appellee/cross-appellant Jeffrey Sherman.

David R. Zaro and Jeanne M. Jorgensen, Allen Matkins Leck Gamble & Mallory LLP, Irvine, California, for defendant-appellee IndyMac Bank, F.S.B.

---

## OPINION

IKUTA, Circuit Judge:

In this case we resolve two questions of first impression in our bankruptcy jurisprudence. First, we hold that a bankruptcy court considering the feasibility of a plan of reorganization under 11 U.S.C. § 1129(a)(11) must evaluate the possible effect of a debtor's ongoing civil case with a potential creditor, whether that litigation is pending at the trial level or on appeal. Second, we conclude that under limited circumstances, a bankruptcy court may exercise its equitable powers to grant retroactive approval of a post-petition financing transaction pursuant to 11 U.S.C. § 364(c)(2).

### FACTUAL AND PROCEDURAL BACKGROUND

In 1996, Jeffrey Sherman sold his law practice to Harbin APC (the professional corporation of John Harbin) through an asset purchase and consulting agreement. The terms of the agreement are not part of the record on this appeal. However, it is undisputed that as part of the deal, Harbin APC agreed to pay Sherman $5,000 a month for ten years in exchange for his consulting services. In 2000, Harbin APC stopped making the consulting payments to Sherman.

### A.

Sherman sued Harbin, Harbin APC, and others in California state court for breach of contract (among other things).

Harbin filed a cross-complaint for a declaratory determination that he was not personally liable for any breach of the consulting agreement. Following the first phase of the trial, the jury rendered a special verdict holding both Harbin and Harbin APC liable for breach of contract in the amount of $414,003.87 (plus interest, costs, and attorneys' fees). While the trial court's ruling on Harbin's declaratory judgment motion was still pending, Harbin filed a voluntary Chapter 7 bankruptcy petition, triggering the automatic stay provision of 11 U.S.C. § 362.

In June 2002, the trial court set aside the jury's original verdict and held that Harbin was not personally liable for breach of the consulting agreement. Harbin then moved to dismiss his Chapter 7 petition. When the bankruptcy court denied the motion, Harbin converted the case to Chapter 11. In the meantime, Sherman appealed the trial court's ruling holding Harbin not personally liable.[1]

### B.

While his state appeal was pending, Sherman filed both an adversary action for breach of contract and a proof of claim in the amount of $716,092.65 (the jury's original state court verdict, plus interest, costs, and attorneys' fees) in Harbin's bankruptcy case. In the adversary action, the bankruptcy court granted Harbin's summary adjudication motion and dismissed Sherman's claims for relief based on collateral estoppel. While dismissing the adversary action, the bankruptcy court ruled that Sherman could seek to reinstate that action if the state appellate court ruled in his favor. The bankruptcy court also sustained Harbin's objection to Sherman's proof of claim, again noting that Sherman could seek to reinstate his claim should he prevail on his state court appeal.

---

[1]The bankruptcy court granted Sherman's request for relief from the automatic stay so he could pursue this appeal to the California Court of Appeal. *See* 11 U.S.C. § 362(d).

On December 11, 2003, before the state appellate court decided Sherman's appeal, the bankruptcy court confirmed Harbin's Second Amended Plan of Reorganization. The plan required Harbin to pay his listed creditors 100 percent of their claims following confirmation. The bankruptcy court found the plan feasible under 11 U.S.C. § 1129(a)(11) because Harbin's allowed creditors were to be paid in full.[2] Sherman, as a party in interest, objected to the confirmation. Sherman argued that Harbin's plan was not feasible under section 1129(a)(11) because it did not reserve an allowance for Sherman's claim should he prevail on appeal. In such event, Sherman argued, Harbin would not have sufficient assets to cover Sherman's claim and would be forced into further liquidation or reorganization.

The bankruptcy court rejected this argument on several grounds. The bankruptcy court reasoned that because it had previously disallowed Sherman's claim, it could not make any provision for the claim or consider the claim in its feasibility evaluation. Additionally, the court concluded that the *Rooker-Feldman* doctrine precluded it from considering the likely outcome of Sherman's state court appeal. However, the bankruptcy court stated that it would not discharge Sherman's claim. The court's confirmation order provided that if Sherman prevailed on his state court appeal, he could file a motion for reconsideration in the bankruptcy court pursuant to *Cobe v. Smith (In re Cobe)*, 229 B.R. 15, 18 (B.A.P. 9th Cir. 1998).[3]

---

[2]Section 1129(a)(11) requires, as a condition of confirmation, that the bankruptcy court find: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

[3]*Cobe* approved a bankruptcy court's summary judgment in favor of a creditor who had won a judgment against the debtor in state court, but held that the debtor could seek reconsideration under Rule 60(b)(5) of the Federal Rules of Civil Procedure, as incorporated by Rule 9024 of the Federal Rules of Bankruptcy Procedure, if the state trial court's judgment in favor of the creditor was later overturned on appeal. 229 B.R. at 18.

## C.

At the time it confirmed Harbin's plan, the bankruptcy court also granted *nunc pro tunc* approval of a previously unauthorized, post-petition refinancing of Harbin's home.[4] In January 2003, Harbin's wife applied for a loan to refinance the above-market mortgage on their Coronado residence. Although Harbin's interest in the residence was an asset of the bankruptcy estate, his wife's loan application listed her as the sole borrower. To facilitate the loan transaction, Harbin executed a quitclaim deed granting his interest in the residence to his wife, so that his wife would appear on the title to the residence as the sole owner. After the refinancing lender, IndyMac Bank, F.S.B. ("IndyMac"), funded the loan, Harbin's wife quitclaimed her interest in the residence back to herself and Harbin, as joint tenants, thereby returning Harbin's interest in the residence back to the bankruptcy estate.

---

[4]Use of the phrase "nunc pro tunc" approval in this context is a misnomer:

> *Nunc pro tunc* amendments are permitted primarily so that errors in the record may be corrected. The power to amend *nunc pro tunc* is a limited one, and may be used only where necessary to correct a clear mistake and prevent injustice. It does not imply the ability to alter the substance of that which actually transpired or to backdate events to serve some other purpose. Rather, its use is limited to making the record reflect what the . . . court actually intended to do at an earlier date, but which it did not sufficiently express or did not accomplish due to some error or inadvertence.

*United States v. Sumner*, 226 F.3d 1005, 1009-10 (9th Cir. 2000) (internal quotation marks and citations omitted); *see also In re Singson*, 41 F.3d 316, 318 (7th Cir. 1994) (observing that the Latin phrase, "nunc pro tunc" authorization, literally "now for then," refers to situations in which the court, after discovering that its records do not accurately reflect its actions, corrects the records to show what actually happened). Therefore, it is more accurate to refer to the bankruptcy court's approval of the post-petition refinancing of Harbin's residence as "retroactive approval."

Nevertheless, given the prevalent use of "nunc pro tunc" in the bankruptcy context to refer to retroactive authorization, we will continue to use this customary formulation here.

Harbin filed with the bankruptcy court a motion for *nunc pro tunc* approval of the refinancing after it was completed. In a declaration supporting his motion, Harbin stated, "I am aware that I should have obtained court approval prior to conducting this refinancing transaction."

IndyMac joined Harbin's motion for *nunc pro tunc* approval and filed its own motion seeking the same. IndyMac's declarations submitted to the court stated it had not been aware that Harbin's interest in the residence was an asset of his bankruptcy estate and had inadvertently overlooked the title report notation indicating that Harbin was in bankruptcy at the time he conveyed his interest in the residence to his wife.

IndyMac argued that the completed refinancing benefitted the bankruptcy estate. The Harbins used the $707,000 loan from IndyMac to retire the $647,000 above-market mortgage on the Coronado residence, thus reducing Harbin's mortgage payments by more than $300 per month. The Harbins also paid off outstanding property taxes of $3,934. Finally, the refinancing provided $53,896.05 to fund Harbin's Second Amended Plan of Reorganization which, if confirmed, would have paid all of Harbin's creditors in full.

Sherman objected to both parties' motions for *nunc pro tunc* approval. Sherman argued that Harbin and his wife acted in bad faith and that IndyMac had constructive knowledge of the bankruptcy proceedings through the title report. Moreover, Sherman claimed that the refinancing did not benefit the bankruptcy estate because it merely lowered Harbin's monthly mortgage payments which were paid out of Harbin's post-petition earnings.

Applying a test similar to that set forth in *Atkins v. Wain, Samuel & Co. (In re Atkins)*, 69 F.3d 970, 976 (9th Cir. 1995), the bankruptcy court granted *nunc pro tunc* approval of the refinancing transaction. Specifically, the bankruptcy court

ruled: (1) it would have approved the refinancing had Harbin made a timely prior application; (2) the refinancing benefitted the bankruptcy estate; (3) IndyMac had a good faith belief that it could enter into the refinancing transaction; and (4) "[c]ompelling equities and the absence of prejudice to interested parties" supported the grant of *nunc pro tunc* approval.[5]

### D.

Sherman appealed both the bankruptcy court's confirmation of the plan and its grant of *nunc pro tunc* approval to the district court. While this appeal was pending, the California Court of Appeal resolved Sherman's state court appeal by reinstating Harbin's personal liability on the original jury verdict. The district court took judicial notice of the Court of Appeal's decision and held that in light of this "changed circumstance," the plan proposed by Harbin was no longer feasible. The district court thus vacated the bankruptcy court order confirming the plan and remanded the case to the bankruptcy court for further proceedings. The district court also affirmed the bankruptcy court's grant of the *nunc pro tunc* approval of the refinancing.

Harbin now appeals the district court's decision holding that his plan is not feasible. Sherman cross-appeals the district court's affirmance of the bankruptcy court's grant of *nunc pro tunc* approval of the refinancing transaction. IndyMac responds to Sherman's cross-appeal.

### JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction over the final order of the district court reviewing the final order of the bankruptcy court. 28 U.S.C. § 158(d).

---

[5]Before granting *nunc pro tunc* approval, the bankruptcy court ordered Harbin to reimburse the bankruptcy estate for all transaction costs relating to the refinancing transaction.

"Because we are in as good a position as the district court to review the findings of the bankruptcy court, we independently review the bankruptcy court's decision." *Pizza of Hawaii, Inc. v. Shakey's, Inc.* (*In re Pizza of Hawaii, Inc.*), 761 F.2d 1374, 1377 (9th Cir. 1985). "The issue whether a plan is feasible—is not likely to be followed by liquidation or further reorganization—is one of fact, which we review under the clearly erroneous standard." *Id.* The bankruptcy court's application of the *Rooker-Feldman* doctrine is a question of law, which we review de novo. *See id.* We review the bankruptcy court's decision to grant *nunc pro tunc* approval for abuse of discretion or erroneous application of the law. *Atkins*, 69 F.3d at 973.

## DISCUSSION

### A.

We first address the question whether the bankruptcy court erred in confirming Harbin's Second Amended Plan of Reorganization. To confirm a plan, a bankruptcy court must find that the plan is feasible, meaning that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11).

[1] To be feasible for purposes of section 1129(a)(11), a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor. *Pizza of Hawaii*, 761 F.2d 1374. In *Pizza of Hawaii*, Pizza, the debtor in the bankruptcy proceedings, was embroiled in contractual and trademark litigation with Shakey's, a national franchiser of fast-food outlets. *Id.* at 1375. Before the extent of Pizza's potential liability to Shakey's was resolved in the civil action, the bankruptcy court confirmed Pizza's plan of reorganization, expressly finding the plan feasible notwithstanding the fact that it failed to provide for the possibility that Shakey's would recover a

large judgment. *Id.* at 1376, 1382. As approved, the plan provided only that should the civil action be decided in Shakey's favor, "there shall be no further distributions to claimants in the class to which [Shakey's] claim belongs, or to junior classes of claimants, until [Shakey's] has received the money or property to which it would have been entitled from the date of confirmation of this Plan, had its claim initially been allowed in the amount finally determined." *Id.* at 1382 (quoting the confirmed plan) (alteration in *Pizza of Hawaii*).

The district court ruled that "the bankruptcy court's finding of feasibility was clearly erroneous because the plan failed to provide for the possibility that Shakey's would recover a large judgment in the civil case." *Id.* Therefore, the district court vacated the plan and remanded to the bankruptcy court "to reconsider the plan's feasibility in light of its estimate of Shakey's claim." *Id.* We agreed, noting that if Shakey's prevailed in the civil action and attempted to collect under the plan, "Pizza would be unable to pay one-fourth of its claims." *Id.* Alternatively, if Shakey's prevailed in the civil action after Pizza had paid all its claims, Shakey's efforts to collect its claim could likely force Pizza into Chapter 7. *Id.*

**[2]** Under *Pizza of Hawaii*, a bankruptcy court cannot adequately determine a plan's feasibility for purposes of section 1129(a)(11) without evaluating whether a potential future judgment may affect the debtor's ability to implement its plan. *Id.* A bankruptcy court's failure to consider such a possibility in discharging its duties under section 1129(a)(11) is clear error. *Id.*; *see also Brutoco Eng'g & Constr. Co. v. Dennis Ponte, Inc.* (*In re Dennis Ponte, Inc.*), 61 B.R. 296, 300 (B.A.P. 9th Cir. 1986).

Here, the bankruptcy court concluded that it could not consider the effect of Sherman's pending appeal in its feasibility analysis for several reasons. We find none of them persuasive.

**[3]** First, the bankruptcy court distinguished *Pizza of Hawaii* because the creditor's claim in that case had not been

reduced to judgment in state court. This distinction is irrelevant. Our reasoning in *Pizza of Hawaii* was not based on the fact that the claim was pending in the state *trial* court. Instead, we held generally "that the bankruptcy court's finding of feasibility was clearly erroneous because the plan failed to provide for the possibility that Shakey's would recover a large judgment in the civil *case*." 761 F.2d at 1382 (emphasis added). Under *Pizza of Hawaii*, the bankruptcy court's obligation to evaluate the effect of a pending claim on the feasibility of a plan does not hinge on whether the claim is pending in the state trial court rather than in the state appellate court.

**[4]** Second, the bankruptcy court reasoned that it could not consider the effect of Sherman's claim on the plan because it had previously conditionally disallowed this claim, whereas the bankruptcy court had not disallowed Shakey's claim in *Pizza of Hawaii*. However, under the bankruptcy court's rulings, Sherman's claim could significantly affect the plan's feasibility in the future. For example, the bankruptcy court held that Sherman's claim was not being discharged, and Sherman could move to have his claim reinstated if he prevailed on appeal. As in *Pizza of Hawaii*, if Sherman prevailed on appeal *before* Harbin's cash reserves were paid out, and Sherman successfully reinstated his bankruptcy claim, Harbin could not satisfy the plan's obligations to other creditors. *See id*. If Sherman prevailed on appeal *after* Harbin's cash reserves had been paid out, Sherman could force Harbin into liquidation or further reorganization. *See id*. Because Sherman's claim could affect the feasibility of Harbin's plan notwithstanding the bankruptcy court's conditional disallowance of the claim, the bankruptcy court was still obliged to consider the claim under section 1129(a)(11).

Third, the bankruptcy court concluded that the *Rooker-Feldman* doctrine precluded the court from taking into consideration the possibility that Sherman could prevail on appeal. The bankruptcy court deemed Sherman's challenge to the feasibility of Harbin's plan to be a "collateral attack on the litiga-

tion pending in state court," because it would, in effect, nullify the state trial court's determination that Sherman had no claim.

[5] The bankruptcy court's conclusion on this point reflects a misunderstanding of the scope of the *Rooker-Feldman* doctrine. The *Rooker-Feldman* doctrine arises from the "unremarkable" observation that Congress has not given district courts general appellate jurisdiction over state court judgments. *Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1078 (9th Cir. 2000) (en banc). Briefly stated, the *Rooker-Feldman* doctrine bars a losing party in state court "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994). Accordingly, the *Rooker-Feldman* doctrine "is confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

[6] Sherman's challenge to the feasibility of Harbin's plan did not implicate the "narrow ground occupied by *Rooker Feldman*," *id.*, because Sherman was asking the bankruptcy court only to consider the possibility that the state appellate court would reinstate the original jury verdict, not to make any substantive state-law ruling or to review and reject the state trial court's judgment. Congress has explicitly given the bankruptcy court jurisdiction to consider questions concerning confirmation of a debtor's plan, and in doing so to estimate the various claims and interests against the debtor's estate. *See* 28 U.S.C. § 157(b)(2)(B) & (L); *see also Gruntz*, 202 F.3d at 1079 (when Congress gives a federal court express jurisdiction over state court matters, for example, by giving the bankruptcy court authority to void, modify, or discharge

state court judgments, the *Rooker-Feldman* doctrine has no application). The bankruptcy court thus erred in concluding that the *Rooker-Feldman* doctrine prevented it from considering the consequences of Sherman's appeal.[6]

[7] Because the bankruptcy court failed to consider the consequences of Sherman's potential success on appeal, it clearly erred in failing to discharge its obligations under section 1129(a)(11). *See Pizza of Hawaii*, 761 F.2d at 1382; *In re Dennis Ponte*, 61 B.R. at 300 (B.A.P. 9th Cir. 1986). Therefore, we affirm the district court's ruling vacating the bankruptcy court's confirmation of Harbin's Second Amended Plan. In doing so, we emphasize the limited reach of our holding. Under the plain language of section 1129(a)(11) and our

---

[6]Harbin relies on the Bankruptcy Appellate Panel's decision in *Audre, Inc. v. Casey* (*In re Audre, Inc.*), 216 B.R. 19 (B.A.P. 9th Cir. 1997), and the district court's decision in *In re Keenan*, 201 B.R. 263 (Bankr. S.D. Cal. 1996), to advance a broader reading of the *Rooker-Feldman* doctrine. *Audre* and *Keenan* considered a debtor's motion to disallow or estimate at a low value a judgment obtained by a creditor in state trial court, and concluded that the *Rooker-Feldman* doctrine prevented the bankruptcy court from granting such a motion. *Audre*, 216 B.R. at 23-30; *Keenan*, 201 B.R. at 266-67. The continuing viability of these decisions is highly questionable in light of the Supreme Court's recent clarification of the narrow ground occupied by the *Rooker-Feldman* doctrine, as well as our recent jurisprudence in this area. *See Exxon Mobil*, 544 U.S. 280, *Gruntz*, 202 F.3d 1074, *Noel v. Hall*, 341 F.3d 1148 (9th Cir. 2003); *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864 (9th Cir. 2005) (as amended), *cert. denied*, 126 S. Ct. 2890 (2006). Moreover, *Audre* and *Keenan* are distinguishable from the situation before us. A debtor's request to a bankruptcy court to reject or reduce a creditor's valid state court judgment against the debtor on the basis of alleged errors in the state court decision bears some relation to the situation contemplated by the *Rooker-Feldman* doctrine, i.e., a state court loser inviting federal court "review and rejection" of a state court judgment. However, a creditor's request that a bankruptcy court simply evaluate the feasibility of a debtor's plan in light of the creditor's potential success on appeal (the situation in this case) does not fall within the *Rooker-Feldman* framework. For these reasons, *Audre* and *Keenan* do not apply to our analysis of the applicability of the *Rooker-Feldman* doctrine here.

decision in *Pizza of Hawaii*, a bankruptcy court must evaluate the possible impact of the debtor's ongoing civil litigation on the feasibility of the proposed plan. However, our decision today does not dictate the conclusion a bankruptcy court should reach after conducting such an evaluation; rather, the bankruptcy court must exercise its sound discretion in considering how such litigation may affect the feasibility of any specific plan.[7]

[8] We thus affirm the district court's vacature of the bankruptcy court's order of confirmation without reaching the

---

[7]The dissent contends that "the majority seems to be announcing a rule that the bankruptcy court must always wait, no matter how long, for the resolution of an appeal to be decided before confirming a plan." Dissent at 4575. This mischaracterizes our holding. Although the bankruptcy court here could have elected to delay confirming Harbin's plan in light of Sherman's pending civil litigation, it had no obligation to do so. However, section 1129(a)(11) did impose an obligation on the bankruptcy court to consider the likelihood of Sherman's success on appeal and the impact of such potential success on the feasibility of Harbin's plan. Due to its misunderstanding of *Pizza of Hawaii* and the *Rooker-Feldman* doctrine, the bankruptcy court erroneously failed to discharge its obligations under this section.

The dissent would have us approve the bankruptcy court's decision to value Sherman's claim at zero, because the state trial court's ruling "was the law at that time." Dissent at 4577. This repeats the error made by the bankruptcy court, which considered itself bound by the state trial court's ruling under the *Rooker-Feldman* doctrine. While our decision would not have prevented the bankruptcy court from valuing Sherman's claim at zero, the bankruptcy court had the duty to exercise its own judgment in reaching such a conclusion, taking into account the possibility that the state appellate court would reinstate the jury's original verdict.

We also disagree with the dissent's contention that our ruling "undermines the importance of finality in the bankruptcy proceeding." Dissent at 4577. Rather, the application of *Pizza of Hawaii* to this case furthers the interests of finality by requiring the bankruptcy court to take into account all likely future events that could impact the feasibility of a plan, including pending litigation, in determining whether a proposed plan is likely to be final and not followed by liquidation, or the need for further financial reorganization.

question whether a plan that was feasible when confirmed may, due to changed circumstances on appeal, subsequently become infeasible. *See Padilla v. Terhune*, 309 F.3d 614, 618 (9th Cir. 2002) (this court "may affirm the district court on any ground supported by the record, even if it differs from the reasoning of the district court"). Although we hold that the bankruptcy court failed to comply fully with the requirements of section 1129(a)(11), we cannot conclude, without the benefit of the bankruptcy court's analysis of the issue, whether the plan was in fact feasible when confirmed. The bankruptcy court is best situated to evaluate, in the first instance, how the potential outcome of Sherman's state appeal might affect the feasibility of Harbin's plan. Therefore, we affirm the district court's ruling vacating the bankruptcy court's confirmation of the plan and remand for further proceedings consistent with this opinion.[8]

## B.

We next turn to the bankruptcy court's *nunc pro tunc* approval of the secured post-petition refinancing of Harbin's residence pursuant to section 364(c)(2). On appeal, Sherman contends that the bankruptcy court abused its discretion in granting *nunc pro tunc* approval and seeks to set aside that ruling.[9]

---

[8]The reality of the changed circumstances at this stage in the litigation is not lost on us: the California Court of Appeal has reinstated Sherman's jury verdict, *Sherman v. Harbin*, No. B164417, 2004 Cal. App. Unpub. LEXIS 7608 (Aug. 18, 2004), *review denied*, 2004 Cal. LEXIS 10877 (Nov. 10, 2004) (No. S128088), and we have little doubt that, on remand, Sherman will move for reconsideration pursuant to the bankruptcy court's August 6, 2003 order and Rule 9024 of the Federal Rules of Bankruptcy Procedure. *See In re Cobe*, 229 B.R. at 18. We thus recognize that, on remand, the bankruptcy court will not need to address the feasibility of Harbin's plan in light of a pending state judgment.

[9]Sherman's appeal of the bankruptcy court's *nunc pro tunc* ruling is not moot under 11 U.S.C. § 364(e), which provides, in pertinent part:

We begin with the underlying rule that Chapter 11 debtors in possession are required to obtain the approval of the bankruptcy court when they wish to incur secured debt. *See* 11 U.S.C. § 364(c)(2), 364(c)(3);[10] *Thompson v. Margen (In re McConville)*, 110 F.3d 47, 50 (9th Cir. 1997). This obligation stems from section 362 of the Bankruptcy Code, which prohibits post-petition encumbrances on the bankruptcy estate. After a debtor files for bankruptcy, an automatic stay goes into effect prohibiting, among other actions, "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4); *see also Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 571 (9th Cir. 1992).

---

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt . . . does not affect the validity of any debt so incurred . . . to an entity that extended such credit in good faith . . . unless such authorization and the incurring of such debt . . . were stayed pending appeal.

11 U.S.C. § 364(e). Here, the bankruptcy court did not give Harbin "authorization . . . *to obtain* credit or *incur* debt" pursuant to section 364. Rather, IndyMac extended credit purportedly secured by a lien on property of the bankruptcy estate without any such authorization. By its plain language, section 364(e) is not applicable to debt incurred without bankruptcy court authorization, even if the bankruptcy court subsequently approves the financing transaction retroactively. This interpretation is consistent with the policy goals of section 364(e) "to overcome a good faith lender's reluctance to extend financing in a bankruptcy context by permitting reliance on a bankruptcy judge's authorization." *Burchinal v. Central Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1488 (9th Cir. 1987) (acknowledging the "Congressional intent of fostering private investment in failing companies by promoting reliance on a bankruptcy court's authorization"). Obviously, IndyMac did not insist on bankruptcy court authorization as a condition to extending financing in this case.

[10]Although section 364(c) refers to a trustee obtaining credit, it applies with equal force to debtors in possession prior to the appointment of a trustee. *McConville*, 110 F.3d at 50. This is consistent with 11 U.S.C. § 1107(a), under which a debtor in possession has all of the rights and powers of a trustee. *Cukierman v. Uecker (In re Cukierman)*, 265 F.3d 846, 849 (9th Cir. 2001).

Section 364(c)(2) provides an exception to this prohibition against creating a lien on property of the bankruptcy estate. Specifically, section 364(c)(2) provides that "the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt — . . . (2) secured by a lien on property of the estate that is not otherwise subject to a lien." 11 U.S.C. § 364(c)(2).

**[9]** We have interpreted section 364(c)(2) as requiring a debtor to obtain the bankruptcy court's authorization *before* incurring secured debt. *McConville*, 110 F.3d at 50. *McConville* held that if the debtor fails to obtain prior authorization, the bankruptcy court may exercise its corrective power to rescind the transaction. *Id*. However, *McConville* also stressed that "[t]he exercise of this corrective power . . . should not occur without regard to the equities of the situation." *Id*. Where the debtor incurs debt without first obtaining court authorization, the bankruptcy court may exercise its equitable discretion to develop an appropriate remedy, provided, of course, that the chosen remedy is consistent with the provisions of the Bankruptcy Code. *Id.*

**[10]** *Nunc pro tunc* authorization with concurrent relief from the automatic stay is one such available remedy. Applying principles of equity, we have recognized the bankruptcy court's equitable discretion to grant retroactive authorization in other contexts where such relief was necessary or appropriate to carry out the provisions of the Code. *See, e.g., Atkins*, 69 F.3d at 973-74; *Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064, 1070-72 (9th Cir. 2004); *see also* 11 U.S.C. § 105(a) (granting bankruptcy courts the equitable power to issue any order "that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]"). Under the right circumstances, retroactive validation of a post-petition refinancing transaction will further the provisions of the Code. The bankruptcy court's grant of retroactive approval may provide a significant benefit to

the debtor's estate, or otherwise assist the debtor in funding a successful plan for reorganization.

**[11]** Moreover, nothing in the language of the Bankruptcy Code precludes the court from considering *nunc pro tunc* authorization of the refinancing as one possible remedy in response to the "equities of the situation" before it. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"). Section 364(c)(2) does not, by its express terms, require the bankruptcy court to authorize the financing transaction before the debt is incurred. Therefore, should a debtor improperly obtain secured financing without prior court authorization, a bankruptcy court's exercise of its equitable discretion in granting *nunc pro tunc* approval pursuant to section 364(c)(2) will not be "inconsistent" with the express provisions of the Bankruptcy Code.

In this case, although the post-petition refinancing transaction of Harbin's residence did not comply with the prior authorization requirement imposed on section 364(c)(2) by our case law, *McConville*, 110 F.3d at 50, the bankruptcy court elected to exercise its equitable discretion to grant *nunc pro tunc* approval of the transaction. In doing so, the bankruptcy court applied the standards set forth in *Atkins*, 69 F.3d at 976.

Although decided in a different context, *Atkins* provides useful guidance on the circumstances that warrant an equitable exception to the prior authorization requirement. *Atkins* involved a violation of 11 U.S.C. § 327(a), which we interpreted as requiring prior court authorization of professional services rendered to the bankruptcy estate. 69 F.3d at 973. We noted that "bankruptcy courts . . . possess the equitable power to approve retroactively a professional's valuable but unauthorized services," but limited that retroactive approval "to situations in which 'exceptional circumstances' exist." *Id.* at

973-74; *see also Okamoto v. THC Fin. Corp. (In re THC Fin. Corp.)*, 837 F.2d 389, 392 (9th Cir. 1988); *Fanelli v. Hensley (In re Triangle Chems., Inc.)*, 697 F.2d 1280, 1289 (5th Cir. 1983) (cautioning that the availability of an equitable exception should not invite the general non-observance of the prior authorization requirement, and that *nunc pro tunc* approval should be limited to "exceptional circumstances"). We held that "[t]o establish the presence of exceptional circumstances, professionals seeking retroactive approval must satisfy two requirements: they must (1) satisfactorily explain their failure to receive prior judicial approval; and (2) demonstrate that their services benefitted the bankrupt estate in a significant manner." *Atkins*, 69 F.3d at 974. In addition, we held that retroactive authorization may be granted only where the untimely request otherwise satisfies the express requirements for such approval prescribed by the Code. *Id.* at 976.

The criteria for retroactive approval set forth in *Atkins* are generally consistent with the equitable principles identified in *McConville*. *McConville*, like the case before us, addressed a lender's failure to obtain prior authorization under section 364(c)(2). 110 F.3d at 50. *McConville* noted that in tailoring an appropriate equitable remedy for a violation of section 364(c)(2), a court should consider whether the lender has adequately explained its failure to seek prior authorization (thus demonstrating its good faith) and whether the loan transaction provided a benefit to the bankruptcy estate. *Id.*

**[12]** From our decisions in *McConville* and *Atkins*, we distill four factors that the bankruptcy court should consider in determining whether to exercise its equitable discretion to grant *nunc pro tunc* approval of post-petition financing under section 364(c)(2): (1) whether the financing transaction benefits the bankruptcy estate; (2) whether the creditor has adequately explained its failure to seek prior authorization or otherwise established that it acted in good faith when it failed to seek prior authorization; (3) whether there is full compliance with the requirements of section 364(c)(2); and (4)

whether the circumstances of the case present one of those rare situations in which retroactive authorization is appropriate. *See McConville*, 110 F.3d at 50; *Atkins,* 69 F.3d at 974. Provided that these criteria are met, the bankruptcy court may, but need not, grant an application for *nunc pro tunc* authorization.

**[13]** Under this standard, the bankruptcy court did not abuse its discretion in granting *nunc pro tunc* approval of Harbin's refinancing transaction. First, on the record before us, the bankruptcy court's finding that the refinancing benefitted the bankruptcy estate was not clearly erroneous. The refinancing benefitted Harbin's bankruptcy estate by providing the necessary cash infusion to fund Harbin's Second Amended Plan of Reorganization. This was a substantial benefit to the estate because, as originally intended, the cash infusion was sufficient to pay Harbin's allowed creditors in full, without requiring further delay or subsequent liquidation.

Second, the bankruptcy court's conclusion that IndyMac offered a satisfactory explanation for its failure to seek prior court approval is not clearly erroneous. Although IndyMac was indisputably negligent in overlooking the title report showing Harbin's status in bankruptcy proceedings at the time he quitclaimed his interest in the residence to his wife, the bankruptcy court acted within its discretion in concluding that IndyMac acted in good faith and would not have proceeded with the refinancing transaction had it been aware of the need to obtain prior court approval.

Third, we note that the bankruptcy court complied with the requirements of section 364(c)(2). Prior to filing his motion for *nunc pro tunc* approval, Harbin and his wife used the proceeds of the IndyMac loan to pay off Washington Mutual's lien on the residence. Accordingly, on Harbin's and IndyMac's subsequent motions for retroactive approval under section 364(c)(2), the bankruptcy court authorized IndyMac to take a security interest "on property of the estate that [was]

not otherwise subject to a lien." 11 U.S.C. § 364(c)(2). The bankruptcy court granted this authorization only after ensuring that the requisite notice and hearing requirements were satisfied. *See id.*; 11 U.S.C. § 102(1); Fed. R. Bankr. P. 2002.

Finally, the bankruptcy court did not abuse its discretion in determining that the circumstances of this case presented one of those rare situations where retroactive authorization should be granted. The bankruptcy court ruled that "[c]ompelling equities and the absence of prejudice to interested parties" favored the grant of IndyMac's *nunc pro tunc* motion. Given the competitive terms of the loan, the fact that the loan, as approved, was intended to fund Harbin's plan of reorganization, and the fact that all transaction costs incurred in the refinancing were returned by Harbin to the bankruptcy estate, we cannot conclude that the bankruptcy court erred.

Accordingly, we hold that the bankruptcy court did not abuse its discretion in granting *nunc pro tunc* approval of the refinancing transaction.[11]

### C.

For the foregoing reasons, we affirm the district court's vacatur of the order confirming Harbin's plan and remand to the bankruptcy court for further proceedings. We also affirm the district court's conclusion that the bankruptcy court did not abuse its discretion in granting *nunc pro tunc* approval of Harbin's post-petition refinancing.

---

[11]In so holding, we do not consider the effect, if any, of the November 17, 2003 stipulation whereby the United States Trustee agreed not to oppose IndyMac's motion for *nunc pro tunc* authorization of its loan conditioned on Harbin's reorganization plan being confirmed with full payment to all unsecured creditors. The United States Trustee reserved the right to file an opposition to the motion for *nunc pro tunc* authorization if the reorganization plan were modified. If Harbin's reorganization plan is modified on remand, the bankruptcy court should exercise its discretion in considering any renewed objections of the United States Trustee to the *nunc pro tunc* authorization.

The judgment of the district court is **AFFIRMED**.

---

CUDAHY, Circuit Judge, concurring in part, dissenting in part:

I concur in Part B of the majority's opinion which affirms the district court's determination that the bankruptcy court did not abuse its discretion in granting *nunc pro tunc* approval. I respectfully dissent, however, as to Part A of the majority opinion. I believe this court should reverse the district court's decision to vacate the bankruptcy court's order confirming Harbin's plan and that the discretion of the bankruptcy court should be sustained in its finding of feasibility.

Although the issue of feasibility is certainly close under the circumstances, I do not agree that the bankruptcy court's judgment of the matter here was clearly erroneous. There is an important element of discretion in reaching a practical judgment here, and the majority seems to be announcing a rule that the bankruptcy court must always wait, no matter how long, for the resolution of an appeal to be decided before confirming a plan.[1] Depending on how long the matter has already been left open for a decision on appeal and on the bankruptcy court's estimate of the chances of reversal on appeal (and other factors), the totality of the circumstances may favor an earlier confirmation of the plan or they may not. To postpone confirmation until the result on appeal is finally known is to lose all account of finality, which is generally a consideration of importance in bankruptcy. Here the fact that the judgment was actually reversed on appeal makes this an

---

[1] The majority requires a bankruptcy court to "evaluate the possible effect of a debtor's ongoing civil case with a potential creditor." (Op. at 4556.) Given that the bankruptcy court already provided for relief pursuant to *Cobe v. Smith (In re Cobe)*, 229 B.R. 15, 18 (B.A.P. 9th Cir. 1998), practically speaking the only option available to the bankruptcy court appears to be to delay confirmation.

unusual case, since only a small fraction of trial court judgments are reversed.[2] That possibility, it seems to me, should not provide the pattern for dealing with this problem.

In fact, the bankruptcy court considered the impact of Sherman's request to delay confirmation on finality and rejected this request finding it unreasonable to delay distributions until Sherman's appeal ran its course. In making this decision, the court considered not only Sherman's interests but those of all parties involved in the bankruptcy proceeding: "He has other creditors to deal with. . . . There are professionals out there. There's a Chapter 7 trustee out there." (ER at 175.)

The real basis for the majority's decision seems to me to be the bankruptcy court's reliance on the *Rooker-Feldman* doctrine—a reliance which I also believe to be erroneous. However, I see *Rooker-Feldman* to be a make-weight and its invocation harmless error in the context of a basic finding of infeasibility. The bankruptcy court's finding on *Rooker-Feldman* is simply not necessary to the outcome. The bankruptcy court was aware of the likely amount of the judgment if successful on appeal and of Sherman's concern that Harbin would not preserve his house to be available for distribution. The court factored these concerns into the decision to confirm the plan and provided Sherman with relief if successful on appeal.

I am also troubled by the majority's application of *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374 (9th Cir. 1985). This case is clearly distinguishable from the present case. Unlike in *Pizza of Hawaii*, the state trial court issued a judgment at the time the bankruptcy court confirmed Harbin's plan. The state court had valued Sher-

---

[2]Title 11 U.S.C. § 1129 (a)(11) defines feasible as "confirmation of the plan is not *likely* to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." Most appeals are not successful, and therefore not "likely" to render a plan infeasible.

man's judgment at $0. Accordingly, the bankruptcy court had disallowed Sherman's claim. The state court judgment was the law at that time. In *Pizza of Hawaii*, there was not yet a judgment at the state trial level, nor was there a claim in the bankruptcy court. To expand the rule in *Pizza of Hawaii* to the present case undermines the importance of finality in the bankruptcy proceeding.

The majority also seems to have lost sight of the specific arrangements the bankruptcy court made for a reversal on appeal, namely allowing Sherman to return to the court to reopen his disallowed claim pursuant to *Cobe v. Smith (In re Cobe)*, 229 B.R. 15, 18 (B.A.P. 9th Cir. 1998). The majority derogates this provision by suggesting the funds will not be available to satisfy Sherman's claim if distribution has been made to other creditors. This is a possibility—but not a certainty—but a contrary solution ignores the rights of other creditors, who must wait indefinitely for satisfaction until Sherman's appeal is decided.